Case number 22-1015 et al. Wynnewood Refining Company, LLC and Coffeyville Resources Refining and Marketing, LLC Petitioners versus Environmental Protection Agency. Mr. Houston for the petitioners, Mr. Hughes for the responder. Morning Council, Mr. Houston, please proceed when you're ready. Okay, please report. Michael Houston, Perkins Coie on behalf of the petitioners. EPA admits, adjoining index 12, that it created the extension rule because it had missed multiple statutory deadlines that are critically important to the administration of the RFS program. Under this court's decision in Americans for Clean Energy, EPA's several statutory violations do not entirely foreclose it from setting a renewable fuel volume obligation. But they do trigger an obligation on EPA to make sure that it reasonably considers and quote minimizes, in the words of this court, the harm to the obligated parties. The extension rule makes things worse for the petitioners, not better. It does that in three principal ways. First, it violates Congress's instruction that there must be at least a minimum of 13 months lead time between when EPA sets an obligation and when the petitioners are required to comply with it. Second, EPA compresses multiple quote calendar years worth of obligations, in the words of the statute, into a matter of just a few months. And third, EPA entirely destroys the value of the critical deficit carry forward provision. The statute entitles the petitioners for any reason to put off their obligations until another quote calendar year. But under the extension rule, our clients can only put off and carry forward a deficit for just one more quarter. The predictable result of all of this is that RIN prices have skyrocketed and the extension rule does nothing at all to address that poor harm on petitions. I'd be more than happy to answer the court's questions, but otherwise I think it might be instructive to take a moment and explain how we got here. Can I just ask, you say that as a result of EPA's rescheduling actions, RIN prices have skyrocketed, but that's a more complicated matter. Is it not, you know, to know exactly what the causal agent is of a price rise? So, Judge Fuller, just because I think the thing that has caused RIN prices to rise is not the extension, it's the late action. And I think that the very best evidence of this is actually a GAO report, and I really encourage the court to read this, particularly at pages 9 to 13 and 24 to 25. It explains in detail precisely why EPA's own officials told the GAO in the course of that report that they understood that when they were very late and then acted, that had a quote substantial impact on RIN prices. But then EPA knows that this happens, and it's just really a matter of simple economics. When EPA comes and for the first time ever requires a number of small refineries to comply with the RFS program by denying hardship, and it says you're going to have to meet multiple years worth of obligations over just the next 14 months, EPA is spiking demand for RINs, and it's doing so in a situation where the supply of those RINs is already fixed. Because remember, we're talking about blending that has already occurred in prior years. We're talking about all the RINs that have ever been, you know, that is possible to generate for 2019, 2021, 2022, they've been generated. It's a fixed supply. And yet EPA's action by being so late, they have created this massive demand. They forced the petitioners to go out to the market. I don't understand why that has anything to do with the role that you're challenging. You talk about compliance, but the rule you're dealing with is when you have to file a report on compliance in a previous year. With respect to a previous year, right? Well, when we have to actually comply, Judge Randolph. I mean, there's a reporting obligation, too. But the extension rule is setting the deadline by which we have to actually comply with the statute when we have to turn in rents. It's when you have to file the report. It used to be March 31st of the following year, right? But now you have two other options that date on when the quarterly report is, et cetera, et cetera. Suppose you win here, right? That means if you haven't filed your reports yet, you're not in compliance. It reverts back to the previous rule. This gives you an extension for filing reports. That's all it does. It doesn't change whether EPA followed the 12-month rule or 13- or 14-month rule or any of that. It just deals with when you have to file a report. Respectfully, Your Honor, I don't think that's quite right. We're talking here about years that have already gone by. The deadlines for that the statute would have enacted for our clients to demonstrate compliance with the RFS obligation, those have already passed. But that is EPA's fault. They are the ones who declined to put out the volumes on time, to deny the hardship petitions on time. We obviously couldn't comply when we didn't know what our compliance was. And they're acknowledging that, and they're trying to mitigate. They say that they are, Your Honor, but I think our core submission is that they are not doing so. And they're not doing so in really three reasons. I think if the court looks at the Americans for Clean Energy decision, which is the last time that we were here. And by the way, I think it's just worth emphasizing, this is the fourth time that refineries have come to this court to talk about EPA needing to get back on track because it had missed statutory deadlines. So this is not a situation where, as my friend from the EPA says, agency resources are limited and sometimes something slips through the cracks. We're talking about an agency that over several years has been laid over and over and over again. Yeah, I want to go back to a question. I mean, you answered a question that I asked. Maybe I misheard you. You said this rule does more than simply give a deadline for when the reports are due, right? Yes. Well, here's the title to the rule. It's annual compliance reports, report submission deadlines. The submission deadlines for annual and quarterly reports shall be as follows. That's the rule, right? Yes. Don't say anything about anything else except when you have to file the report. The report is a proof that we have complied, Your Honor, that we have turned in RINs. That's what the extension rule is all about. We have to turn in our RINs, EPA, and then we have to file a report that proves that we turned them in. So the operative, what the extension rule does, the real meat of it, is it sets the deadline by which we need to have the RINs in hand. But again, the statute- It sets a deadline. It sets the deadline by which we need to have the RINs for a particular compliance year. Each year, we have a renewable volume obligation, and there's a deadline by which we have to turn them in. Now, EPA has missed all of those deadlines, so the extension rule is resetting them. But it's violating the statute in two ways when it's doing that. Why isn't this a mitigation measure in the terms of what the ACE Court required? It's a mitigation measure because EPA has missed the deadlines, and it's giving you more time to file your yearly annual compliance report. Because, Your Honor, it is not mitigating any of our core harms. And so if the court looks, as I'm sure the court will, at the Americans for Clean Energy decision, you will see that there were three principal reasons that this court concluded in ACE that EPA had mitigated the parties. First, it had ensured that they had a reasonable path to compliance. Second, it had ensured that there were enough RINs out there in the market that petitioners could go out and acquire them. And third, EPA had made sure that parties would be able to take advantage of the deficit carry-forward provision. That's the mitigation that this court described at pages 722 and 723 of the ACE opinion. But none of those things are available to us. We asked, in the course of the extension rule, for a remedy, for a type of remediation that would make it possible for us to comply. But EPA rejected our request. We cannot, we do not have a reasonable, responsible path for compliance. But can I ask, so put aside the carry-forward for a second, because I think at the outset you mentioned three things. The carry-forward was the third, and then there were the other two, which had to do with the time periods. The 13 months and the 12 months, I think, is what you're referring to. That's correct. And with respect to ACE, isn't it the case that also with the rule that was reviewed in ACE, there could have also been made the same argument about the 13 months and the 12 months? So for some of the deadlines, there were of course a number of deadlines that were reset in ACE. But at least for some of them, the same argument could have been made. The same argument could have been made, Your Honor, but I want to stress it wasn't. Right, I take that point. And so you could say that, well, ACE would have come out differently as to those years if that argument had been made. But I'm just trying to establish the predicate that, in fact, what was upheld in ACE was something that couldn't have been upheld under the argument that you're pressing today. I think that's right, but I don't think that's that surprising. The court cannot be faulted for not engaging with the arguments that the parties before. Sure, but I just want to establish the point that, and I think analytically all that makes sense, but the practical result is that under your argument today, ACE was wrongly resolved, not decided based on arguments that were presented. But the rule in ACE shouldn't have been allowed to be sustained. I think that I would express the point just slightly differently. I think that the rule that EPA put forward in ACE was unlawful for reasons that were not presented to the court in ACE. And thus, I don't think what I think is emphatically clear is that ACE does not stand for the proposition that our statutory arguments are wrong because the arguments weren't made to the court. So the court doesn't typically weigh in on questions that aren't presented to it for good and substantial reasons. And so when no party made this argument to the ACE court, ACE doesn't foreclose the argument just because there was a problem. It's akin to a sort of drive-by ruling that sometimes— I mean, ACE did talk about the time periods for compliance. Yes, but they were critically different, Your Honor. In ACE, what the court said was important was that EPA had given the petitioners 15 months to obtain compliance. And in many cases, even more than that, for again, there were four guidelines in ACE and each one had a different time period. But when the court looked at this, it said, we think 15 months is more than enough time for you to go forward. And maybe they were right about that. But the statutory minimum is 13 months. And that is, I think, the one provision of this statute that is just expressly clear. Well, there's no provision that says 13 months. Well, I agree that there is no provision that says 13 months, Your Honor. But I really—I mean, there is a deadline by which EPA has to set the volume, and it's November 30th. And then we have the following calendar year. I think if you just put those two provisions together, there's no way to say that we don't—we're not required to have at least a minimum of 13 months. If you get to the—I mean, you think it's inconceivable that there could be a compliance deadline during the compliance year? I'm sorry, I don't think I— So it's 13 months if you say you start with November and you get to the very end of the year? Yes. Is it not—it would be flatly inconsistent with the statute if EPA had a compliance deadline that was during the course of the year? Absolutely, Your Honor, for two reasons that I think are clear from the text of the statute itself. First, 75-450-2A1 talks about the fact that the way that you calculate our obligation has to be, unquote, an annual average basis. And second, of course, we have to demonstrate compliance over the calendar year. So taking Your Honor's hypothetical, if EPA had promulgated the volumes in November but then said you're going to have to demonstrate compliance in July, we can't comply with that mandate in July without—we're not going to be able to demonstrate that we conducted the appropriate amount of lending on an average annual basis. Why not? I mean, one might think in the old days that a regulated party here would be putting RINs in their account as they import or refine the fuels. And if they're doing that as they go along, then they're not going to be subjected to ebbs and flows in the—or spikes and valleys in the RIN prices. So maybe people don't do that anymore because they have leeway. And as you say, the compliance filing is not just a filing. It's actually some action coming—or has come to mean some action coming into compliance. But let's say EPA thinks that that's problematic for some of the reasons that you point out about the spikes in the RIN market, and it decides, like the IRS does with respect to taxes, let's have quarterly filings, and yeah, we'll true it up at the end. Anything in the statute that prevents that? Yes, absolutely, Your Honor. Two things, I think. The first, again, is that we have to demonstrate compliance on an average annual basis. And then the second thing is the deficit carry-forward provision. The EPA has some flexibility. It has discretion to push out deadlines beyond what they were required. But it can't supersede the minimum amount that it's guaranteed. And so I guess I'm not sure why that's responsive to my hypothetical, because you could have the average annual and just have that worked out when you true up at the end. Yeah, I guess that's conceivably possible, Your Honor, but there would still have to be— I still think that that means we're talking about four deadlines sort of over the course of the year. And really, just like in the tax context, you have one tax bill for the entire year. You might have to pay as you go that bill, but that's something very different from what EPA is saying. This is like saying EPA is saying you have to pay four years of your taxes, you know, on date one, and then three months later, and then three months later. That's a really— Well, if you get an extension until October and then you pay your next taxes on time, you have to pay your taxes, you know, within four months of one another, six months at least. I agree with that, Your Honor. But you have the minimum amount of leave time that the tax code in the hypothetical guarantees. And what they can't do is drop down below the 13 months of requirement. And then I think the other—but the other point that really drives this home is the deficit carry-forward provision. The statute says that when we have any reason why we can't comply, we want to wait, it's advantageous for our business, whatever. You don't have to give a justification for using deficit carry-forward. When the petitioners take advantage of a deficit carry-forward, it's entitled to carry a deficit for an entire, quote, calendar year. I don't think that EPA has any discretion to take away that calendar year's worth of extra flexibility. And that's a critical piece of the bargain that Congress put into this statute. It imposes a very serious obligation on the petitioners— Did EPA say you can carry over for more than a calendar year, or is that just statutorily limited? The statute says you can't carry over for a calendar year. I mean, I think, honestly, Your Honor, that EPA probably could give us more than a calendar year if it had to do that, you know, if it found reason. I think that the court can—the agency can extend deadlines beyond statutory minimums, but it can't drop below statutory minimums. Did EPA not do that here with the— there's not the action that's directly under review, but I thought there's an alternate— did they not allow an additional carry-forward period? There is an alternative, a different rule, Your Honor, is exactly right. We've challenged that rule, too. I mean, I'd be happy to explain why we think that rule has very serious problems. But just on this question of extension, I thought that that's actually what happened. They have purported to extend some of the other deadlines even further. If I might just say one sentence about what's really the fundamental defect in that rule, it's based on the assumption that that extra time and that taking advantage of other RIN vintages will make it possible for petitioners to buy RINs at a reasonable price. But it's just empirically false. The court can go and see that all of the RIN vintages cost essentially the same. In other words, the RINs that were generated in 2019 cost about as much as the RINs for 2020 and 2021 and 2022. But just changing what year's worth of RINs we buy doesn't help. It's the price that is the problem. And it's the price that is really the thing that EPA has made no serious attempt to address in the extension rule. The price is our biggest harm. EPA has to minimize that harm. But they haven't addressed anything about price in the extension rule. I guess, why isn't that the obligated party's fault in not, you know, doing the dollar cost averaging approach to RIN accumulation? I'm really glad that you asked, Your Honor. And I would really just take one moment and sort of explain exactly why. I understand the instinct behind that question. The GAO report really helpfully explains why that there was no responsible path for compliance. This is dealt with at pages 24 and 25 of the GAO report. They studied this precise issue. Kern Oil is one of the petitioners in this case. Kern Oil tried to do that. They said, okay, we're going to take what you might call a conservative approach. We're going to acquire RINs all along sort of on the expectation that one day we might be required to comply. And if we get hardship relief, you know, okay, great. But Kern Oil, by virtue of that business decision and EPA's mismanagement of the program, suffered massive business losses. And the reason was that Kern was acquiring these RINs all along. But then suddenly EPA, long after the statutory deadline, granted hardship relief. And it granted hardship relief to a whole bunch of other parties as well. And then it refunded their RINs. EPA said, here are your RINs back. Those RINs are worthless. And it was tens of millions of dollars in losses that Kern incurred. This was the subject of litigation in the Ninth Circuit. That's discussed in our reply brief. The Ninth Circuit found that EPA had violated the law in that instance because they had inflicted tens of millions of dollars in harm on Kern Oil. And they put forward a remedy that was designed to make Kern Oil whole. And that, I think, additionally speaks to my friend from the EPA's point that there's no response, you know, that there's no remedy here. I think we've proposed a number of different remedies. We were talking about a situation for years that have already gone by. All of the blending that can be done for 2020 is already done. There's no benefit to the environment that could come from the extension rule. What we're now talking about is who's going to pay. And I think that Kern Oil puts forward one way that the court could design a remedy to address that, which would essentially require EPA to give a credit between the RIN price on the date that they should have acted and the RIN price today. Or... Oh, go ahead. No. Or, but lastly, the alternative remedy is, I think, and the best remedy is the one that actually EPA put forward for 2018, the alternative compliance demonstration approach. EPA said, it's just too far gone. You know, the situation in 2018 is so messed up that we can't unwrangle the knot. And so we're going to have an alternative approach. That's all EPA needs to do to get... The alternative approach meaning you owe nothing. They did not require compliance demonstration by requiring RINs. That's essentially correct, Your Honor. Now, I'm not saying that EPA has to do that. I'm not saying that's the only remedy that EPA can come up with. What I am saying, though, is that EPA exercised its discretion and found that in a situation very much like this one, years gone by, the market is not at all working the way that it was supposed to, as EPA acknowledges. The right thing to do is sort of stop, take a pause, press the reset button, and get back on track going forward. I'm sorry. The question I had was, you've mentioned a couple of times that we're talking about time periods that have already passed. All the transactions were already undertaken and expectations have congealed and all that. Yes. As I understand it, EPA took account of that by basing its decisions, its backward-looking decisions, on the actual state of the market. So two points about that, Your Honor. First, that's in a different rule that we have also challenged. That's not part of the extension rule. EPA... And I think that's part of the challenge that, you know, in all candor, we are trying to comply with here. EPA is putting forth three and four different rules designed to address this problem. We, of course, can file a petition for review only for one rule at a time. But I want to engage with the point directly. EPA says, okay, that was our mitigation strategy. We reduced the volumes for this given year. They reduced them by about 15 percent, but it costs 10 times more today to buy RINs than the date that it would have if EPA had been on time with the 2020 volumes. So I think that when EPA has said, well, the price has gone up tenfold, we're going to give you a 15 percent haircut, I mean, the math on that obviously shows that we are much, much worse off. And I don't want to... You know, I think it's important to give the Court a sense of the scope of the obligation here. We're just one of the petitioners in this case. We're talking about obligations of $150 million for one compliance year, and then three months later, you need $175 million, three months after that, $183 million. So these are massive costs. This is our largest expense besides crude oil. It costs more to demonstrate compliance with RFS than labor for the petitioners. So these are extraordinarily imposing obligations. And when you're talking about an obligation, again, the scope of which went up tenfold in price because EPA was so late in missing statutory deadlines, the fact that they shaved 15 percent off the obligation is really just not going to address our fundamental harm. Can I get back to a question that Judge Randolph asked? So the question had to do with what would be the upshot if, hypothetically, you were to prevail in your challenge? So if you were to prevail in your challenge, the extension rule, if you get vacated, would get vacated. Yes. And then does that set you back to a situation in which the compliance deadline then is the upshot of your argument would be the statutory date, the November 30th date, which has already passed? Yes. So are you worse off? No, no, no, no. If the court vacates the extension rule, EPA is going to need a new deadline. It's going to have to reset the deadlines again, but it's going to have to do so in a way that actually addresses and minimizes the harm that we're facing. So it's going to have to put, I mean, as you said, Your Honor, the statutory deadline for compliance has already passed. So the extension rule purports to put a new deadline in. We think that's unlawful. If the court agrees with us, EPA will have to set yet another deadline in the future. But when EPA sets that deadline and when it takes account of what is going to be required on that deadline, it's going to have to address the price. That's the critical point because that's our harm. And so under Americans for Clean Energy, EPA has to responsibly study the actual harm to the petitioners and address that harm. That's what the extension rule doesn't do. And that's what I think would be the key, the massive benefit to the petitioners of ruling from this court to vacate the extension rule. I'm sure my colleagues don't have additional questions for you at this time. Thank you, Mr. Hughes. We'll give you a little time for rebuttal. Mr. Hughes. Good morning, and may it please the court. Jeffrey Hughes from the Department of Justice on behalf of EPA, with me at council table is Meredith Miller. I'd like to highlight four reasons why, in issuing the extension rule, EPA reasonably exercised its authority to second the extension rule. First, the text of section 754502A3 directs EPA to issue regulations that contain compliance provisions to ensure that the requirements of this paragraph, that's section 754502, are met. Chief Justice Srinivasan, I think you mentioned the statutory compliance deadline. But in fact, the statute does not set the compliance deadline. That is set by a regulation. This provision, section 754502A3, does not provide for annual compliance deadlines or any other particular intervention. Second, in ACE, this court held that EPA reasonably issued delayed volume requirements because it, among other things, determined that obligated parties had sufficient time to acquire rings to comply with the standards for EPA-granted compliance deadline extensions, similar to those issued here. Third, here, EPA determined that the intervals provided for the extension rule allowed obligated parties sufficient time to acquire rings without overheating them. And fourth, this schedule will allow EPA to get back on the track set by the statute. With respect to the text of the statute, the refinery's argument for inflexible compliance deadlines rests on a misinterpretation. The provision directing EPA to set compliance deadlines does not require annual compliance deadlines at all. EPA could require, as Chief Justice Srinivasan and Judge Pillar mentioned, quarterly compliance deadlines. Alternatively, two of the petitioners here argued in their comment on the proposed extension rule that EPA should require compliance for 2019-2022 at one time, that's in J16-17. I would also note the three compliance deadlines issued here, 2019, 2020, and 2022, fall more than 13 months after the standards were initially promulgated, though the 2022 standards were subsequent. Next, regarding- I didn't quite follow that point. Yes, so the 2019, the annual rule was signed on June 3rd of last year, and the 2019 rule, but the 2019 and 2020 rules were initially promulgated in 2018 and 2019. And so since those days, well more than 13 months have elapsed between the issuance of the compliance deadline. Now, the 2020 rule was subsequently modified downward in June, so less than 13 months has elapsed between the issuance of that rule and the compliance deadline. With respect to 2022, again, the rule was signed on June 3rd of 2022, and the compliance deadline is, as we expect, would be September 1st, 2023. So maybe I'm missing something, but if the other side's argument is not 13 months and neither lesser nor greater, but is just a minimum of 13 months and greater is fine, then what does that do to the point that you just made? Your Honor, as I understand their argument, there must be at least 13 months between the issuance of the rule and the compliance deadline. And so for 2019, 2020, as initially promulgated, and 2022, they have 13, they have more than 13. And so you can set that, so that can be set aside for those. What can be set aside? The question of whether they've received the 13 months between the issuance of the rule. Is that what they're arguing? Are they arguing that, well, they also are arguing that there has to be a, an interval between separate compliance deadlines or they're not? They are also arguing that there needs to be one year between compliance deadlines as well. I would just point out that, again, there's nothing in the statute that speaks to the amount of time that must elapse between compliance deadlines. I think we pointed out in a brief EPA. When you say compliance deadline, what do you mean? The deadline by which the obligated party needs to submit its compliance report showing that. Report, right. It's not compliance. It's just a report of what happened. Was that during an act? Is the year a calendar year or can it, can the one year annual be other than a calendar? Sorry, is the question that our compliance years and annual year compliance reports have to be filed annually? There's no requirement that compliance reports in the statute be filed annually by regulation. EPA has said it has such a compliance reports are typically filed. If you can simplify this for me. When EPA sets requirements and so the small refiners have to comply and then mix their fuel with 10% renewables or whatever, does EPA always do that before a calendar year in which compliance is required? Your Honor, in this case, it has not. Or so how can, if you set the, I don't know what this has to do with the extension rule, but if you set the requirement for 2022 in July, then how in heaven's name can a small refiner comply with that? They don't even know what the rule is until halfway through the year.  First is EPA has suggested to, or has, you know, has told the obligated parties that they should be radically acquiring RINs throughout the year in order to make sure they comply. So as they're producing fuel, as they're selling fuel, they should be acquiring RINs to make sure that they can comply with their obligation when the time is due. Can you talk louder?  My apologies, Your Honor. The EPA instructs the obligated parties to acquire RINs as they're purchasing or importing non-renewable fuel such that they'll have sufficient RINs when the time, when the compliance date comes. In addition, as this Court has pointed out in Monroe Energy case, through the years at to be because they're laid out in the statute. Now, that's another word that's kind of thrown around here. There's a volume for the entire United States about the amount of fuel that will be used in a year. You're not talking, when you say volume, that's not what you're talking about. I'm talking about the volume that what the statute provides is the amount in section 7545 O2B provides the volumes of renewable fuel to be introduced into the transportation sector of the United States.  Which, you know, once that is, once the, any waivers or adjustments are made, that is, and the, there's a, the amount of fuel used for the year is projected. That is then converted into a percentage, which obligated parties can use to determine what their obligation is. I thought that the response was, I mean, you don't know how many RINs to set aside or purchase or have available until, you know, the percentage of the renewables that this annual standard requires you to mix in. And so you have blenders blending on old standards. If the new standards never been promulgated, and I thought the way EPA responded to that when it was late in setting the standards was that it set the standards based on what was actually done. So it's sort of, it's like the lead, the following rather than the leading indicator. That's correct Judge Hillard for the years 2020 and 2021. And that's, I mean, I can't, I can't imagine how it could be otherwise. I guess if it's during the year, you could tweak it upwards and just say like catch up to the regulated parties. But if the standard is not set until after the year is entirely over, there's only that one choice now. But I think EPA could take into account if it wanted the RIN carryover bank in determining, but it hasn't. Here for 2020 and 2021, the years have passed, the volumes are set at volumes actually used, which ensures sufficient RINs for compliance by all obligated parties. And the volumes actually used would then be the volumes that are being blended based on the prior year's percentage? Is that how it happens in practice? Your Honor, I'm not entirely sure exactly how it's calculated. My understanding is that it's the amount of renewable fuel actually introduced. But somebody's introducing. Yes. And they're having to blend for every gallon sold. Like we buy at the pump. Correct. That's my understanding. But why did you limit your answer to Judge Pillow to 2020 and 2021? Is there a year for which EPA didn't base it on actual experience? 2020, in 2020, it wasn't a completely retrospective rule. It was signed on June 3rd. And so it has forward-looking compliance to it. But then for anything that's retrospective? Yes. I want to reiterate that for 2020, it was initially promulgated prospectively. But looking back, given the disruptions to the transportation fuel market, given COVID-19, that amount was reduced to the amount actually used. And then 2021, the year it passed by the time the annual rule came out, and that was set at the amount actually used. But isn't the other part of the answer to why it isn't always set to the amount actually used is because if it's set prospectively, as I believe it was for the 2019 year, it determines how much is actually used. That's correct. And it can push. I mean, this is all a supply-push rather than demand-pull program. And so they're saying you're required to use these higher proportions, and therefore that's going to be the compliant amount. That's exactly right, Your Honor. When it's prospective, there's a market-forcing element to it that is driven by increasing volume set in the statute in O2B. And for this reason, and this is one of the reasons that I think the refineries' argument that the price caused by EPA delay in issuing the annual rules is not correct, as the volumes increase, the price of the renewable fuels goes up, or the price of the wind goes up. Excuse me. What would you point to? Your opposing counsel pointed to the GAO report. What would you point to to counter? I thought you just said the price spike was not caused by the scheduling. There's no evidence in the record with respect to what causes the price spike, Your Honor. The GAO report certainly isn't in the record. And in our response to comments, we simply pointed out that there is an extremely complicated issue, and they provide no evidence that it was, in fact, caused by any EPA delay. That means you think the GAO report is wrong? Your Honor, I just think the GAO report is post-decisional. It is addressing something different from the issues here, and it is not in the record. Just explain to me, why is it addressing something different on this issue? Your Honor, the GAO report is directed to the administration of the small refinery exemption program, which is not at issue in this rulemaking. But isn't that what precipitated all of this, is the small refinery exemption? I thought the whole reason for the delay here is because of the administration, or at least a large part of the reason, no? Part of the reason for the delay was the small refinery exemption program, but in the sense that there were cases pending in the Penn Circuit and in the Supreme Court that would have an effect on the small refinery exemption program and the way EPA viewed it. But also, another cause for the delay was that for the first time for the years 2020 through 2022, EPA used its reset authority to set the volumes, and that is a lengthy process that requires EPA to consult with the Secretaries of Agriculture, the Secretaries of Energy, and to consider statutory factors in order to set volumes. In other words, this was a transition period from the statutorily set volumes to EPA set volumes, so this was a growing pains in the head. There is a transition after 2022, and it addresses the same statutory factors, but there's also a provision that says that if EPA reduces the volumes according to its waiver authority by certain percentages over a certain period of time, it then will reset the volumes for future years for which there are statutory volumes according to its waiver once it considers certain percentages. So it's the same thing. So it chose to reduce the volumes and then it had to do a bunch of recalculations? Exactly. I had trouble figuring out in any of the materials before us why there was the delay, and there was the small refinery exemption stuff which was mentioned in the regulatory materials. Maybe I just lost over. Where is it about the reset I believe it's in the in the in the preamble, Your Honor. In one of the first pages it explains there's the it's the small refinery exemption and then also resetting the volumes in light, particularly of reduced use of fuel in the during COVID-19. Sorry. See, we're running out of time. If a refiner does not meet the whatever the maximum or minimum amount of renewable fuel that has to be added to the regular fuel, it doesn't meet it for the year. Before it files the compliance report, can it adjust by buying up RINs? And it buys them even outside of the compliance year? Yes, Your Honor. An obligated party can purchase RINs to ensure that it complies with its renewable fuel obligations. So it can retroactively comply with the requirements? That's correct, Your Honor. It can purchase RINs that are of the vintages that are usable with respect to that compliance deadline. So for 2020, that would be 2019 RINs and 2020 RINs, and it can purchase those RINs today after the compliance. I have two other questions that are just for my edification. Are the requirements for the percentage of renewable fuel dependent on the season of the year? There are. I don't believe so, Your Honor. Okay. Is there a maximum amount of renewable fuel beyond which an internal combustion engine will not operate? Certainly, there are certain vehicles where the fuel, if the percentage of ethanol is above 10 percent, it may void the warranty. I'm not just talking about vehicles. I'm talking about lawnmowers, power blowers, two-cycle engines, four-cycle engines? I think there are certainly certain vehicles, combustion engines, that can't use certain types of renewable fuel, but other types of engines can use, for instance, instead of E10 that has 10 percent ethanol, E85 that has 85 percent ethanol. Thank you. Can I just ask you to address briefly the argument about the carry-forward provision that the way that the EPA fashioned things in the extension rule counters the carry-forward guarantee? Yes, Your Honor. Mr. Houston referred to the fact that ACE relied in part on the carry-forward provision in determining the EPA reasonably used its authority to issue late standards, and I would point out that the intervals between the compliance deadlines at ACE were virtually identical to those here. Four months at ACE here, four months, and then five months. And so the obligated parties still have time, still have the opportunity here to carry forward a deficit, and they can use different RIN vintages in order to comply with that, with the carry-forward deficit. So if they carry forward from 2020 to 2021, that means that whereas they used to only be able to use 2019 and 2020 RINs to comply with that, they can now use 2020 and 2020 RINs. And they can do that because of what? Because of the carry-forward provision. And so when they carry forward, the RIN vintages are, the compliance here determines what the RIN vintages they can use, and so if they carry forward, it gives them more flexibility in terms of those vintages. There is a time at which, in the RINs, it's only a one-year carryover. Correct. So if you have, as here, a bunch of deadlines that have been delayed and then bunched together, you're going to have, instead of, let's say you have four years of deadlines for compliance filings occurring in one year, the RINs carryover is only going to be the preceding actual calendar year, not the year preceding the compliance period, right? I mean, if all is going perfectly, you have the exact number of RINs that everybody needs for compliance, because the whole point is, the only reason there's a market is because blenders are generating the RINs, and the people who have to show compliance are the importers and the refiners, and so they have to buy them from the blenders, right? And presumably there would be a perfect number available, and the price would be stable if everything worked as the statute envisioned. But if you have a carryover possibility, but then those RINs expire, RINs could have been created in a year that all those RINs die before anybody needs to use them for compliance, if it was two years ago, three years ago, four years ago, as opposed to just last year. Is that part of what you understand to be the case, their complaint? And if so, what's your response to that? I don't understand petitioners to be now cannot be on the September 1st, 2022 deadline for compliance. Can they be used or not? I believe so, Your Honor, but I can't. I thought he was saying that when there was a remedial moment when EPA gave back everybody's RINs, but they were useless because they were too old. Well, in that situation, Your Honor, the compliance deadline had come and passed, in the particular instance where he's talking. So getting back the RINs that you saved up, it's sort of like the person who was careful in the face of the exotic mortgages and managed to stay afloat doesn't get relief, and the person who was reckless gets relief. I mean, I think they're sort of saying that they're disincentive to being conservative in your banking of RINs, because if you get relief at the end of the day, you've paid for something that's useless. And so I guess that seems to me a big part of the equities of their case, and I'm not entirely sure what EPA's response to it is. Your Honor, I think that it's not applicable here, where small refineries have known since December of 2021 that EPA intended to deny the small refinery petitions, and they've had since that time to be acquiring RINs in order to... Could they comply well before the deadline? Even though EPA is pushing the deadlines forward, could they just... Yes, they have the option to do so. Okay. And you don't... So if they're still having to comply in March of this year, they're still having to file for the 2021 compliance period, right? Yes, Your Honor. The RINs that were accumulated in the 2021 year and can be carried forward to 2022. That's correct, Your Honor. But they can't be carried forward to 2023? Your Honor, so the way that the carry forward provision works is if, assuming that a obligated party is up to date on its obligations, it can carry forward its 2021 obligations forward to 2022, at which point it needs to retire both of those obligations. You're right. I'm confusing two different things. One is that the RINs, you can borrow, you can use RINs from the prior year, you can bank your RINs, and the other is that you can postpone your obligation. That's correct. So can you bank RINs from 2020 and use them to pay in March 31st of 2023? I'm guessing no. But RINs from 2020 to comply with the 2021 deadline in... To apply the 2023 deadline that is now the compliance deadline after the extension rule because the compliance deadline has been moved forward to... The publication of the final standard was moved forward to July 2022. I didn't know what the standard was. Maybe you could have complied in July, but you're allowed till March. And I'm just wondering whether part of the market spikes are because the carry forward of your RINs is no longer functional because of the passage of time. My understanding, Your Honor, is that the March 31st deadline for 2021 can be complied with using 2020 or 2023. The March deadline is now, it's the compliance deadline for 2021 is now March 2023. Correct. Okay. And you're saying you can use 2020... And 2021. 2021. Is my understanding. Because it's the 2021 compliance year. Exactly. But if it's, I mean, if it's a compliance year, if it's a 2022 compliance year, then you can't use the... Then you can use the 2021 RINs or the 2022. But not the 2021s. Exactly, Your Honor. That's helpful. Thank you, counsel. Mr. Houston, we'll give you three minutes for rebuttal. Thank you, Your Honor. Several points. Judge Randolph, this is not just about a compliance report. We are required to go out and buy something that costs $150 million. That is what the extension rule is imposing on us. And then we have to go out three months later and buy something else that costs $175 million. My clients cannot generate RINs. They do not lend. In many cases, in some cases, at least, it's because the product that they ship goes through a pipeline that won't accept blended fuel. That's why Congress created a program where we have no choice but to go out and buy these RINs from the parties that generate them. It's a massive obligation. On the text, my friend from the EPA refers to the text. I want to direct the court to 7545.05d. But why does that depend on when you have to file your report? Whether you have to go out and buy them or not. The hardship denials is the thing that triggers, requires us to buy them at all. But EPA was very late. It repeatedly missed 90% of its statutory deadlines to adjudicate those hardship petitions, which are the thing that determined whether we have any obligation in the first place. Plus, as Your Honor was pointing out in the call with my friend from the EPA, we're talking about EPA putting out a rule in 2022 determining what my clients needed to have done in 2021, in 2020. You know, it's very much a retroactive application. So before you file the report, you can bring yourself, which would show if you just did nothing and just filed what percentage of renewable fuels you put into the mix, you would not reach the 10%. Not remotely, or we would be in violation of the statute, we would be subjected to very severe penalties. And so you think retroactively, you can bring yourself into compliance? That's what EPA demands of us, Your Honor. They demand that. And that is by buying these RINs? That's correct, Your Honor. That's exactly right. But there's a fixed supply. And then your argument is the more time you have to enter that market, the cheaper the RINs are going to be? Absolutely. This is what the GAO found, that the amount of time that EPA acts, whether it acts and when, has a very significant increase on price. So if we vacate the rule, it gives you less time? No, Your Honor. If you vacate the rule, EPA is going to have to go back and do it again. And they're going to have to do one of two things. They're either going to have to put in a new extension rule that reasonably mitigates our harm, or they're going to have to adopt something like the alternative compliance demonstration approach, or they're going to have to do something like the that originally was you have to file a report by March 31st of the next year. So if you vacate the amendment, then all that's left is a requirement that you have to file by March 31st of the following year, which means you're out of compliance. I'm sorry, Your Honor. If I might just correct you, it's not quite right. It's March 31st for years that have gone by. Without the extension rule, we would have just statutory deadlines. And those are years in the past. EPA cannot obviously hold us liable for having not complied when at the time that those deadlines were in effect, EPA didn't have the volumes out, it didn't have the hardship petitions adjudicated. I think that's common ground between the parties. And so what that means is if the court vacates the extension rule and issues instructions to EPA to carefully study the harm, the real harm that we're experiencing, that's going to mean that EPA is going to put a new deadline in place. How do we get the authority to do that? I think the court would vacate the rule and then it should find that what made the rule unlawful was a failure to reasonably consider our harm. That would provide, I think, the guidance that EPA needs to know that it needs to be more attentive to these statutory deadlines going forward and needs to take seriously the harms to petitioners. I think current oil is a really good example. My friend from the EPA said just by rateably all the time, current oil did it and they suffered tens of millions of dollars of losses as described in our brief. I just want to return if I might for one second to the text. 754505B says if for any reason a petitioner wants to carry a deficit forward, it's entitled to do so during the following calendar year. But the extension rules plain text says we get to carry forward a deficit only for three months and then we're required to comply. That's a plain violation, I think, of Congress's instruction. The last point I want to make here is just about the GAO report, which is critically important to deciding this case. It's absolutely relevant. The GAO analyzed the very same question that this court is going to consider. Did EPA act lawfully? The GAO studied its process. It's not part of the administrative record. It's not, but I don't respectfully, that doesn't matter because I'm not asking the court to consider it for that purpose. My point is EPA put out a rule and in the rule it made assumptions and it put forward an analysis. We're saying that that assumptions and analysis violated the Administrative Procedure Act. The GAO studied that very question and it agreed with us. It said EPA ran a faulty process and it made assumptions that have been proven false. When you talk about the amount of money that the regulated parties have to pay, presumably in a functioning market, they've charged consumers along the way for what they expect to be that cost. If that is not required by EPA, then don't the regulated parties get an enormous windfall of the same scale of what you pointed to? No, not at all. My clients, three of the petitioners in this case, have stay applications pending in the 5th Circuit and the 11th Circuit. One of them has gotten a stay. They have shown that they face imminent irreparable harm. If the extension rule stands and EPA is allowed to impose these kinds of costs on us, the damage to my clients is catastrophic. So it's not about, we're not the ones that are reaping a windfall. We are trying to comply. I'm just saying in a functioning market, the assumption in putting the compliance obligation on importers and refiners as opposed to, let's say, lenders, is that in a functioning market, the cost doesn't matter where you put that obligation because you'll charge commensurate prices for your product and you'll be able to buy the requisite RINs to cover those prices. So presumably, in planning and in setting those prices, that has been taken into account. But then now, if there's relief, I mean, maybe the prices are way higher than was planned for, but some increment presumably was collected with the expectation that one of the costs of this business is the RIN cost. And I'm just saying that it's, you know, the dollar amounts sound large, but it's going to something that, for which you're collecting money. Totally understand, Your Honor. The premise of Your Honor's question began with, in a functioning market. This RIN market is not functioning remotely. I understand that position. Are you saying that none of your clients have, in fact, garnered prices that reflect the compliance prospect? Yes, I think that's absolutely right. The idea that we are able to pass on these costs to our customers is just not borne out by reality. Again, we're talking about a tenfold increase in the price going back just a couple of years. So it's like saying, you know, the pump that charges for gasoline, we all expect that to fluctuate, but the gas company can't start charging a ten times increase and expect there to be no impact on the bottom line. That's what EPA is doing to us. And again, the reason why that's happening is because precisely because the market is not functioning. And EPA has, you don't have to take my word for it, EPA has admitted this. They have acknowledged in the alternative compliance demonstration approach and in the extension rule that there are only a very small number of parties that hold a super majority of the relevant RINs. So again, remember that, you know, the supply for 2021, 2022, it's fixed. No more can be generated. There's a finite number of them and a super majority of them, small number, we're talking about 10, 11 parties, they hold 75% of the RINs. And now EPA in the extension rule is telling petitioners that they have to go to those companies that hold them and buy. The predictable result, as I think any high school level economics student would tell you, is that those companies holding them are going to charge massive premiums for them. And that's the RIN market is not functioning. It is not liquid. But the real problem with the extension rule is they're not addressing that. That's the fundamental problem in this market right now. And that's the fundamental reason why the harms are so high. Instead, EPA, you know, what we get is the extension rule and EPA says, well, we'll just give you a few more months to comply. And the drop in to zero, the number of small refinery exemptions granted in 2019, is that a Poly-Frontier result? Or why did the number of exemptions granted go to zero for 19, 20, 21? Because they haven't been decided yet. Because EPA fundamentally changed the approach by which they were considering those petitions. It's not a result of Poly-Frontier. On the contrary, Poly-Frontier told EPA to not be so strict in essence. But it's also not because it hasn't happened yet. They just haven't. Oh, that's correct, Your Honor. The EPA has put out a blanket denial. It has said we're denying all the ones that are pending, and we never intend to grant hardship relief again. And we think that's a flagrant statutory violation. In candor, it's a problem for another day. It's another, you know, it's another decision that EPA has put out that we have very aggressively challenged. And, you know, I'm confident that it is unlawful. But it is a part of the story, as I think Chief Judge Srinivasan mentioned, because it's one of the suite of actions that was late that EPA then needs to try to make up for. The extension rule is their purported attempt to make up for it, to meet the standard that this Court imposed in Americans for Clean Energy. Can I just ask one last question, which is you said in the face of this massive market misallocation, and there's rents are held by a small number of companies and they're going to spike the prices, all the extension rules gives us is a few more months. And but isn't all you're asking for a few more months beyond that? No, no, no, I'm sorry. No, we're no, we're asking for sort of, I think I would say an entirely new regime. We're asking for EPA in the future, in future years to follow the statutory deadlines, put out the volumes when they're required to and give us the statutory minimum 13 months of leave. That will address that will entirely address the problem in the future. And it will allow EPA to get back on track. Then we have a question. Okay, we have a couple of years from backward looking ones, a couple of past years where things we got real, where EPA got really off track. The question is what to do about it. But again, I think EPA already had a solution in the alternative compliance demonstration approach. If the Court, if that's not, you know, satisfactory to the agency or the Court, the Court could adopt the same approach as the Ninth Circuit in Kern Oil and EPA could give us a credit for the difference between when they were late. And that's not a 12 month, 13 month issue. It's not. Okay. At that level, Your Honor, we're talking about what we're talking about. We know EPA violated the law. They made a mistake. And the question is, what do we do about it? So when you're talking about the remedy for that has nothing to do with the 12 months, 13 months as a vehicle for getting it. That's right. That's a statutory violation that happened in the past. The question is what to do about it. Have you filed a petition for rule making with EPA, making the arguments you're making? Absolutely, Your Honor. All of the points that we're making about the fact that the rim market is... What has happened? Oh, I'm sorry. Maybe I didn't understand Your Honor's question. We submitted comments... The GAO report came out in November. Yes, that's correct, Your Honor. Of this, of this... 2022. Right. That's new. Have you, and my question is, you come up with all these hardships that are, which I don't, you know, have no way of knowing one way or the other, but you said, but have you filed a petition for rulemaking with EPA, bringing these matters to EPA's attention and asking for a rule of the sort that would deal with... You'd have to deal with a heck of a lot more than the extension. I understand that point, Your Honor. When the GAO report came out in November, it said to EPA, you know, we're sending that, they obviously sent it to EPA and told them, go back and study this thing more, look harder at this problem. That was the GAO's recommendation to the agency. The agency did that. It put out then in December, a new finding that confirmed that we're right, that EPA's assumption built into the extension rule about the ability of petitioners to pass on their rim cost was wrong, that that was empirically flawed. Does that December report... I don't... You didn't mention that. It came out after our reply brief, Your Honor. It even... But I think all that that just shows is that the extension rule, which was put out back in February of 2022, was based on a series of assumptions and an analysis by EPA. We argued in our comments and we've argued to the court that those assumptions and that analysis was faulty. The GAO has... That's the fundamental question I think this court is going to decide in this case. Okay, I've got it. GAO looked at it and says we were right. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Pillard, Randolph